# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 9, 2014 Session

## STATE OF TENNESSEE v. WILLIAM EDWARD ARNOLD, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1778     Joseph P. Binkley, Jr., Judge**

———————————

### No. M2014-00075-CCA-R3-CD - Filed January 7, 2015

———————————

Defendant, William Edward Arnold, Jr., was indicted by the Davidson County Grand Jury for three counts of aggravated sexual battery and three counts of rape of a child for acts that took place while Defendant was a mentor for the victim through Big Brothers Big Sisters. Prior to trial, Defendant sought to introduce evidence of the victim's prior sexual knowledge pursuant to Tennessee Rule of Evidence 412. The trial court granted the motion in part but prohibited the introduction of any extrinsic evidence at trial. At the conclusion of the proof at trial, the trial court granted a motion for judgment of acquittal on two counts of aggravated sexual battery, finding them "impossible" under the facts as presented to the jury. The jury convicted Defendant of the remaining charges: one count of aggravated sexual battery and three counts of rape of a child. The trial court denied the motion for new trial and sentenced Defendant to an effective sentence of twenty-five years. On appeal, Defendant challenges the trial court's denial of the motion for judgment of acquittal as to the counts for which he was found guilty, the denial of the motion for new trial, and the trial court's ruling on the admissibility of evidence under Tennessee Rule of Evidence 412. After a thorough review of the record, the applicable authorities, and the issues, we determine the evidence is sufficient to support the convictions, and the trial court properly denied the motion for judgment of acquittal. Further, we determine that the trial court properly determined that specific instances of conduct of prior sexual behavior of the victim were not admissible under Rule 412(c)(4). Additionally, we agree with the trial court's determination that due process permitted the victim to be subject to cross-examination, limited by Tennessee Rule of Evidence 608. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed.**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

James O. Martin, III (on appeal) and Fannie J. Harris (at trial), Nashville, Tennessee, for the appellant, William Edward Arnold, Jr..

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Defendant was indicted by the Davidson County Grand Jury for three counts of aggravated sexual battery and three counts of rape of a child for acts that took place while Defendant was a mentor for the victim, N.M.,[1] as part of the Big Brothers Big Sisters program during the time period of August 1, 2007, to November 23, 2010. The victim was born in April of 1998.

*Trial Testimony*

At trial, the following testimony was presented to the jury. The victim, N.M., met Defendant through the Big Brothers Big Sisters program at the Boys and Girls Club where he attended after school camp and summer camp.[2] The victim and Defendant eventually did things together outside of the Boys and Girls Club, like "go eat, and just like go to like football games," "play laser tag," and "have fun." The victim often went with Defendant to Defendant's home.

The victim alleged that the first abuse started a few months after Defendant and the victim started meeting off site. The next incident the victim remembered occurred in the "bonus room" of Defendant's home, next to the garage. At the time, the victim was in the fifth grade. The victim described the incident as follows:

[Defendant] used to get up and sit next to me on the couch next to the wall. And then eventually he told me to get up and then he started to rub my thigh

---

[1]It is the policy of this Court to refer to minor victims of sexual abuse by their initials.

[2]Mary Walker of the Boys and Girls Club testified that Defendant and the victim officially began their site match as mentor/mentee in August of 2007 and transferred to a community match somewhere around January of 2009, after the site at which they had been meeting closed. According to the records of the Big Brothers Big Sisters program, the match was closed based on a request from the victim's family on November 10, 2010.

and the inside.

. . . .

And then he eventually moved my head over to his lap and I didn't know what to do. So then he did it to me and then he looked at me like it was my turn and I did it to him and I started to choke and gag. So he eventually raised my head up. And that was the first time on the oral part.

The victim explained that Defendant pulled down his pants and then "touched [his] private part with [Defendant's] mouth."[3] When the incident concluded, Defendant told the victim to go "fix" himself, so the victim went into the bathroom and pulled up his pants. When the victim left the bathroom, Defendant "pretended like nothing happened." Defendant later drove the victim home. During the ride, Defendant told the victim that if he told anyone about the incident, "no one" would believe him and that it was "our little secret."

The victim recalled another incident during which Defendant sat next to the victim on the couch and put his hand onto the victim's lap before Defendant started rubbing the inside of the victim's thigh. Defendant then "picked up his hand and moved [the victim's] hand over to his private part. And he started to rub it up and down while my hand was on it. And then - and then he took [the victim's] head while [Defendant] was rubbing it and [the victim] started to suck [Defendant's penis]."

The victim also described an incident occurring in the bonus room at Defendant's home during which the victim was on the couch when Defendant told him to get up. According to the victim, Defendant turned him around and Defendant "started to rub his [own] private part" before he pushed the victim down on the couch and started rubbing his "behind." The victim stated that "then [Defendant] started to like go in and out with his finger. And then he eventually stuck his private part in my behind. And then I began to cry. But it just seemed like he didn't care, because he kept on going." The victim described that he felt "some wet and sticky stuff or something like that" before Defendant "pushed [the victim] off of him." Defendant eventually took the victim home. During the car ride Defendant told the victim if he told anyone about what happened, people would think that he was "gay."

The victim described in detail at least one other incident of anal sex during which

_____

[3]The victim later explained that fellatio occurred approximately "seven to eight" times during the mentor relationship.

Defendant and the victim were sitting in the bonus room of the Defendant's house.[4] Defendant smiled at the victim and told him to "get up" before bending the victim over the arm of the couch. Defendant pulled the victim's pants down, rubbed the victim's behind with his hand, "put his finger in the hole," and then inserted his penis into the victim's anus. The victim stated that he started to "cry again, because I didn't know why I was letting him do it."

The victim described at least one incident during which Defendant masturbated the victim to the point of ejaculation. The victim testified he felt "confused" because some of the things that Defendant did to him felt "good," but he wondered why the two could not have a "normal mentor relationship."

The victim testified that, at some point during the abuse, Defendant and his wife were going through a divorce. He testified that things got "worse," and the abuse occurred more frequently in the car than at Defendant's house during this time.

During the summer of 2010, Defendant asked to take a break from the mentor relationship. The victim was both "hurt and relieved." The break lasted for approximately a month before the relationship started back again. The first outing after the break was to a golf event. The victim stated that he notified his mom in "August, September" that he wanted to discontinue the mentor relationship because it "wasn't right."

The victim did not tell his mother, S.B.,[5] about the abuse until several months later when they "got into an argument" about the victim's sexual communication with a boy over the internet. The victim's mother gave him a "whupping" and asked him several questions about whether anyone, including Defendant, had ever touched him inappropriately. The victim did not answer her directly but eventually nodded his head and started to cry when she asked if "William" touched him. In response, the victim's mother got out the Bible, asking the victim to place his hand on the Bible and swear that Defendant touched him. S.B. called the police.

The police came to the victim's residence and performed a brief interview. The victim was later given a forensic interview and a medical examination in late 2010. As part of the

---

[4]The victim later testified that there were "more" times that Defendant inserted his penis into the victim's anus and that it occurred "a lot." On one of these occasions, the victim and Defendant started out wrestling with their shirts off, and it eventually led to Defendant's sticking his penis into the victim's anus.

[5]In order to protect the victim's identity, we have chosen to utilize initials for his family members.

medical examination, the victim was questioned about his history. When asked if he had any sexual contact with peers, the victim replied that he had sexual contact only with "the person that touched me." According to Sue Ross, the nurse practitioner who completed the medical examination, the victim's exam was "totally normal" and there was "no sign of acute or chronic trauma to the anal/genital area." The victim had reported that the last sexual contact occurred "several months" prior to the examination. Ms. Ross opined that there was nothing "inconsistent" with the medical findings when compared to the victim's report of the last sexual contact. In other words, it would have been unlikely to find evidence of sexual contact during an examination several months after the sexual contact was alleged to have occurred.

At trial, the victim explained that in 2011, after the mentor relationship with Defendant ended, he met his mother's boyfriend's brother, W.C.L.[6] The two engaged in a sexual relationship that lasted several months. According to the victim, it "just felt right." Additionally, he wanted to "feel good with [W.C.L.] because of things [he] learned from [Defendant]."

During cross-examination of the victim, counsel for Defendant pointed out several inconsistencies in the victim's testimony with regard to the years during which certain events occurred. Counsel specifically noted that the victim stated in his forensic interview that he had anal sex with W.C.L., whereas at trial the victim stated that they did not engage in anal sex. The victim insisted that his relationship with W.C.L. started after his relationship with Defendant ended. Additionally, the victim insisted that he met Defendant when he was in fifth grade, in 2008-2009. The victim also acknowledged that his mother filed a civil suit naming both Defendant and the Boys and Girls Club as parties.

The victim's mother, S.B., was supportive of the victim's participation in the Big Brothers Big Sisters program. She had interaction with Defendant on a limited basis. S.B. noticed that shortly after the mentor relationship moved "off site," the victim would say that he did not want to take part in mentoring.

In November of 2010, S.B. was looking at the victim's Facebook account when she noticed that there were several "chat boxes" open discussing sexual content. S.B. confronted the victim, asking him if anyone had ever done anything "inappropriate." When asked, the victim acknowledged Defendant touched him inappropriately. She reported the abuse to the police.

---

[6]We have chosen to identify this individual by his initials because he was a minor at the time of the relationship.

Defendant's ex-wife, Angela Lake, testified at trial for the State. She married Defendant in 2004. In October of 2009, the couple brought home a baby from the hospital with the hopes that they would be able to eventually adopt the child. In January of 2010, the couple started the process of adoption. The couple started experiencing marital difficulty in May of 2010 and filed for divorce based on irreconcilable differences. The divorce was final in July of 2010. Defendant "opted out" of the adoption. Ms. Lake finalized the adoption in August of 2010.

Ms. Lake met the victim on at least one occasion and knew him to be present in their home at least ten times. Once the investigation into the relationship between Defendant and the victim started, Ms. Lake was interviewed by police. She was asked if she suspected Defendant of any of the alleged actions and stated, "If you were to ask me if he had a - a hidden family or a wife or some children out there and he may have another woman, I would say yes, but if you're asking me if he touched a little boy, that is not the man that I was married to or the man I know."

Defendant testified at trial. He explained that he had an undergraduate degree from the University of Tennessee in Sociology with a minor in Broadcast. He also had a Masters and Doctorate from Tennessee State University. At the time of the trial, he was employed by the Tennessee Board of Regents. He admitted that he met the victim through the Big Brothers Big Sisters program. He got involved with the program because a fraternity brother told him about it and thought that it would be a good fit for Defendant. When Defendant started the process to become a mentor, he was employed by the Tennessee Higher Education Commission as the Director of Interagency Programs and Academic Grants.

Defendant confirmed that he was matched with the victim in the fall of 2007. Defendant explained that he met weekly with the victim at the Boys and Girls Club throughout the 2007-2008 school year. Defendant did not see the victim again until January of 2009 when he became a community based mentor for the victim.

Defendant would pick up the victim "two to three times a month." He kept the dates on his Blackberry calendar. Defendant described several things that he did with the victim, such as taking him to Adventure Science Center, an event at Vanderbilt about going to college, taking the victim and his brother for a haircut, and ice skating. Defendant and his wife bought shoes for the victim for his birthday in 2009. Defendant also recalled taking the victim and other "mentees" to purchase Mother's Day cards for their mothers in 2009.

In September of 2010, Defendant found out that he and his wife were chosen to adopt a baby that was due in October. This development led to a decrease in the frequency of Defendant's visits with the victim. Defendant and his wife took custody of the child in

October. Despite his newfound fatherhood, Defendant was able to take the victim to a winter social sponsored by Big Brothers Big Sisters at a Methodist Church located in downtown Nashville, a hockey game, and the "MLK Day convocation at Tennessee State."

Defendant testified that the victim was unavailable for visits in February of 2010 because "[h]e broke his arm." In March, Defendant and his wife "started having marital problems, that [Defendant] knew were pretty extreme." Defendant testified that he and his wife both had affairs and that the couple "couldn't come to any agreements on staying together." Defendant explained that after February, he did not bring the victim to his home because he "didn't want him to see [the couple] in such a tense environment." Defendant moved out of the house on May 27, 2010. He and his wife filed for divorce, and he agreed to let his wife adopt the child that had been placed in their care in October.

Defendant did not see the victim again until early summer of 2010, the beginning of the First Tee Program, "a golf program that teaches moral conduct through golf." The program was scheduled to take place from three to four-thirty on Tuesdays for eight or nine weeks beginning June 1, 2010. Defendant took the victim to the program weekly until June 29, 2010, which was the last time he saw the victim. Defendant explained that his "divorce was about to be final."

Defendant emphatically denied each allegation of sexual abuse. He first learned of the allegations when he received a telephone call from the victim's mother.[7] Defendant called several character witnesses including his father, William Edward Arnold, Sr., and Aaron Powell, a friend and fraternity brother.

At the conclusion of the trial, counsel for Defendant moved for judgment of acquittal. After hearing argument on the matter, the trial court granted the motion as to two instances of aggravated sexual battery that were alleged to have taken place in Defendant's car. The trial court found that these events were "physically impossible" given the testimony at trial as to the size of the victim, the fact that he was wearing a seatbelt, and the layout of the interior of the vehicle.

---

[7]According to Defendant, the victim's mother wanted to meet him at a nightclub to discuss the allegations. Defendant offered to meet with the victim's mother at his attorney's office. Defendant later learned that the victim's mother was making the telephone call from the police station. She did not attend the meeting as scheduled, and Defendant did not hear anything further from her until he received a lawsuit for $3.5 million. Defendant countersued for $1.5 million because the allegations were "a lie and . . . slanderous."

The jury found Defendant guilty of the remaining charges as stated in the indictment: one count of aggravated sexual battery and three counts of rape of a child. After the jury rendered its verdict, Defendant made a motion under Rule 29 of the Tennessee Rules of Criminal Procedure for a judgment of acquittal. After a hearing, the trial court denied Defendant's additional motion for judgment of acquittal with respect to the remaining convictions. The trial court also denied a motion for new trial, finding that it "did not disagree with the jury's verdict." Defendant appeals.[8]

*Exclusion of Evidence under Tennessee Rule of Evidence 412*

Prior to trial, Defendant filed a motion pursuant to Rule 412 of the Tennessee Rules of evidence.[9] In the motion, the defense sought to introduce evidence of specific instances of sexual conduct by the alleged victim "for the purpose of showing the motive of the alleged victim to lie about the true identity of the person with whom he had sexual relations, and in order to show that his knowledge of sexual matters was acquired from a third person and homosexual pornographic material." The defense sought to introduce the following: (1) a "Metro School Record" from February 21, 2003, wherein the victim "fondled another child's penis in class and later lied to the teacher about who initiated" the contact; (2) testimony from W.C.L., a minor, about the homosexual relationship he had with the victim; and (3) records from Vanderbilt Medical Center from July 21, 2011, and March 7, 2012, to show the victim had knowledge of sexual matters "based upon homosexual pornography, sexual relationship with . . . male peers, frequent masturbation causing medical diagnosis 'Dysuria.'" Counsel for Defendant argued that they were entitled to present the evidence "under the confrontation clause in order to present the argument to the jury that [the victim] had a motive to lie . . . about the accusation against [Defendant] because he wanted to continue his relationship with [W.C.L.]." Additionally, defense counsel relied on Tennessee Rule of Evidence 412(c)(1) and (4) as well as Rule 608 of the Tennessee Rules of Evidence.

At the hearing on the motion, the victim testified that between March and June of

---

[8]After oral argument, on October 9, 2014, Defendant filed a motion to stay appellate proceedings. In the motion, Appellant argued that the filing of a petition for writ of error coram nobis in Davidson County required the stay of the appellate proceedings pending the outcome of the petition in the lower court. This Court granted the motion for stay via order on October 30, 2014. On November 20, 2014, the Davidson County Criminal Court dismissed Defendant's petition for writ of error coram nobis. No appeal to this Court was initiated from the dismissal within thirty days as required by the Tennessee Rules of Appellate Procedure. Defendant filed a motion to lift the stay on January 5, 2015. This Court granted that motion by order.

[9]Although the Honorable Joseph P. Binkley, Jr., presided over the jury trial, the Honorable Cheryl A. Blackburn heard and determined this pre-trial motion.

2011, he had a consensual "sexual relationship" with W.C.L., the brother of his mother's ex-boyfriend. At the time, W.C.L. was sixteen years of age, and the victim was thirteen years of age. The relationship included "masturbation" and fellatio. All of the events occurred at W.C.L.'s home in Franklin. There were approximately ten occasions on which there were sexual encounters between the victim and W.C.L. The victim also recalled a trip to Beech Bend Park, in Kentucky, in approximately June of 2011 during which W.C.L. attempted to have sex with the victim.[10]

The victim testified that he first told someone about Defendant in November of 2010 and testified that he did not meet W.C.L. until sometime around Christmas of 2010. The victim also testified that he met W.C.L. several months after his mother started dating Demareo Lee, which would have been in 2009. The victim testified that he did not know W.C.L. "at the time [he] told [his] mother about [Defendant's] touching [him]."

Detective Robert Carrigan also testified at the hearing on the Rule 412 motion. Detective Carrigan was the lead detective on the case, investigating the allegations of abuse made by the victim against Defendant. The victim's mother made an initial offense report on November 23, 2010. The victim completed a forensic interview on December 2, 2010 and was examined at Our Kids Center in Nashville sometime before Christmas of 2010. Sometime around July of 2011, the victim disclosed sexual contact with a peer to someone at the Department of Children's Services. Detective Carrigan learned of the allegations after they were reported by the victim. Detective Carrigan did not pursue investigation of this matter after discovering that the events occurred in Williamson County. Additionally, he indicated there was no reason to disclose because the incidents with W.C.L. occurred after the abuse by Defendant.

W.C.L. testified that he "smoked pot" almost every day and that it affected his memory. He could not recall when he first met the victim but knew that it was after his brother started dating the victim's mother. W.C.L. could not remember how old he was when the relationship began, what year the relationship began, or how long ago the activity occurred. He thought it was before he graduated from high school in 2011.[11] W.C.L. testified that "it really wasn't a relationship. It just happened [between himself and the victim]." The first time anything sexual occurred, W.C.L. was asleep and the victim "came

---

[10]The victim did not recall that during previous interviews by police personnel and a counselor at Our Kids Center he made claims that he had anal sex with W.C.L..

[11]W.C.L. admitted that in an interview by Franklin Police Detective Tamara Mick in December of 2011, he claimed that the sexual contact with the victim occurred in late 2010, and happened on five to seven occasions. He testified, however, that even at that time, he told police he was not sure of the timing.

in my room feeling on my leg, and then one thing led to another," and the victim "pretty much just sucked my penis." W.C.L. thought that he performed fellatio on the victim "once." W.C.L. could not recall how many times this occurred. W.C.L. admitted that he went to Beech Bend with his family and that the victim was present. He admitted that there was an "encounter" in the restroom at Beech Bend but that nothing sexual happened at that time. He could not recall when that trip occurred but thought that it was prior to his graduation from high school in 2011.

W.C.L. testified that he stopped having contact with the victim because he "wanted to date other guys." The victim sent a text to W.C.L. after they stopped having contact. The text message asked if the victim could "send a picture of [his] penis." W.C.L. was unable to state when he received this text or what cell phone provider he was utilizing at the time he received this text.

The mother of the victim, S.B., testified at the hearing. She testified that she started dating Demareo Lee, the brother of W.C.L., sometime around the end of March of 2009. She recalled the date because the two met while she was recovering from surgery. Demareo Lee eventually moved into her home, but she did not recall meeting Demareo Lee's family in Franklin, including W.C.L., until at least the end of 2009 or beginning of 2010. She thought W.C.L. would have been present during at least one of these family gatherings.

S.B. testified that the victim first told her about the abuse by Defendant on November 21, 2010. She recalled that around December of 2010 or January of 2011 the victim started hanging out more with Demareo Lee's brother, W.C.L.. S.B. also recalled a trip to Beech Bend, sometime around Memorial Day of 2011. The victim told his mother during the summer of 2011 that he had a "sexual relationship with [W.C.L.]." The victim explained to his mother that he "didn't like it" and was "ashamed" and "didn't understand why he wanted to do it." The victim thought that his behavior and relationship with W.C.L. was somehow a "response or reaction" to his abuse.

Demareo Lee testified that he moved in with S.B. and N.M. shortly after her surgery in 2009. He stated that he did not introduce his family to S.B. or N.M until about one year after he moved in with S.B. His relationship with S.B. ended in September of 2011.

At the hearing, the trial court advised the parties that the February 2003 incident from preschool was irrelevant and inadmissible. Further, the trial court ruled that the medical records from Vanderbilt were extrinsic records and, therefore, inadmissible.

After the hearing, the trial court took the remainder of the matter under advisement. In a written order, the trial court granted the motion in part and denied the motion in part.

The trial court looked to whether the evidence about the relationship was admissible during cross-examination of the victim and, if so, whether extrinsic evidence of the relationship was admissible. In its order, the trial court noted that even though the motion cited three categories of sexually-related evidence, counsel for the defense orally indicated the intent to limit the issue to the admissibility of the victim's sexual relationship with W.C.L. The trial court also found that counsel for the defense "conceded" that the evidence was "not admissible pursuant to 412 because consent is not at issue (since the defense is arguing the acts never occurred) and none of the reasons set forth in section (c)(4) apply to the facts." The trial court concluded that "evidence regarding the prior sexual relationship is inadmissible pursuant to Rule 412."[12]

The trial court went on to determine that the evidence was partially admissible based on Defendant's argument that the exclusion of the evidence violated due process, in particular the Confrontation Clause. Specifically, the trial court noted that the purpose of the evidence was to "show the victim was covering for another relationship" and extrinsic evidence was admissible in a limited capacity. The trial court deemed it "permissible for the defense to inquire in limited fashion about the victim's prior sexual relationship with [W.C.L.] (such as the dates it occurred, how long the sexual relationship lasted, etc.) during the cross-examination of the victim." The trial court cited Tennessee Rule of Evidence 608,[13] "Evidence of Character and Conduct of Witness," in determining the following:

> [W]hile the requirements of Rule 608 have been satisfied, and the defense

---

[12]Defendant denies that trial counsel "conceded" that Rule 412 did not apply.

[13]The rule provides, in relevant part:

Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, . . . may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness. . . . The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;

(2) The conduct must have occurred no more than ten years before commencement of the action or prosecution. . . .

Tenn. R. Evid. 608(b)(1)-(2).

[may] question the victim about his previous relationship with [W.C.L.], the defense is not able to introduce any extrinsic testimony or evidence as to the issue, including but not limited to the testimony of [W.C.L.] or statements from his forensic interview, the cross-examination of [the victim's mother], the testimony of [the officer from Franklin], or the Franklin Police Department record.

In other words, the trial court determined that while admissible pursuant to due process, the trial court deemed the introduction of the evidence was limited by Rule 608.

Defendant argues on appeal that the trial court erred by excluding evidence of "specific prior sexual activity of [the victim] to demonstrate that [the victim's] knowledge of sexual matters was the result of his relationship with another child" under Rule 412. Specifically, Defendant insists that he should have been permitted to introduce evidence of the victim's sexual relationship with another male that involved "the exact type of acts" of which he accused Defendant in order to call into question the victim's credibility. Defendant argues that he is entitled to present the evidence under the Confrontation Clause in order to show that the victim had a motive to lie about Defendant's actions because he wanted to continue the relationship with W.C.L.. Further, Defendant also insists that he did not "concede" that Rule 412 was inapplicable. The State insists that the trial court did not abuse its discretion because counsel for the defense conceded that Rule 412 did not apply and the exclusion of the evidence did not violate Defendant's constitutional rights.

The Tennessee Rules of Evidence establish specific guidelines for admitting evidence of a victim's sexual behavior. Specifically, Rule 412 governs the admissibility of evidence about a sex crime victim's prior sexual acts. According to the Advisory Commission Comments to Rule 412, these guidelines have been established to maintain "a balance between the paramount interest of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy."

Subsection (b) of the rule deals with the admissibility of reputation or opinion evidence and subsection (c) governs the admissibility of specific instances of conduct. In this case, subsection (c) provides the relevant authority for the evidence Defendant sought to introduce at trial. Subsection (c) states as follows:

Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:

-12-

(1) Required by the Tennessee or United States Constitution, or

(2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or

(3) If the sexual behavior was with the accused, on the issue of consent, or

(4) If the sexual behavior was with persons other than the accused,

(i) to rebut or explain scientific or medical evidence, or

(ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or

(iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe the victim consented.

Tenn. R. Evid. 412(c). It is a rule of relevance, *see State v. Brown*, 29 S.W.3d 427, 430 (Tenn. 2000), and we will not overturn a trial court's Rule 412 ruling absent an abuse of discretion. *State v. Sheline*, 955 S.W.2d 42, 46 (Tenn. 1997).

Before evidence of a victim's sexual behavior may be admitted at trial, the accused must file a written motion ten days prior to trial, accompanied by an offer of proof describing the specific evidence and the purpose for introducing it. Tenn. R. Evid. 412(d)(1). After notice has been given, the trial court must conduct a jury-out hearing to determine whether the evidence is admissible. Tenn. R. Evid. 412(d)(2). "If the court determines that the evidence which the accused seeks to offer satisfies subdivisions (b) or (c)" of the rule, then the court must decide whether the probative value of the evidence outweighs the risk of unfair prejudice to the victim. Tenn. R. Evid. 412(d)(4). "[T]he evidence shall be admissible in the proceeding to the extent an order made by the court specifies the evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined." *Id.*

Even if the proof sought to be introduced by a defendant falls within the parameters of admissibility under Rule 412, however, a victim's knowledge of sexual matters also must

-13-

be relevant to an issue in the case. *See* Tenn. R. Evid. 402; *see also Brown*, 29 S.W.3d at 431 (recognizing that evidence meeting the threshold admissibility requirements of Rule 412 may nevertheless be inadmissible pursuant to other rules of evidence); *State v. Douglass Leon Lyle*, No. E2012-00468-CCA-R3-CD, 2013 WL 1281857, at *12-14 (Tenn. Crim. App. Mar. 28, 2013), *perm. app. denied* (Tenn. Sept. 11, 2013) (finding no error on the part of trial court in excluding evidence of sexual knowledge of the victim where evidence was deemed irrelevant).

Moreover, the evidence could still become admissible if required by the Constitution. The trial court herein acknowledged, as recognized by Rule 412(c)(1), there are instances where otherwise inadmissible evidence must be admitted in order to protect the constitutional rights of the accused. *See Chambers v. Mississippi*, 410 U.S. 284, 295-96 (1973); *State v. Brown*, 29 S.W.3d 427, 436 (Tenn. 2000). Our state supreme court has stated:

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

*Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301). This Court must consider and balance the principles of relevance and hearsay under the Tennessee Rules of Evidence with the rights of the accused to confront and cross-examine witnesses and to call witnesses in his defense when determining whether the evidence is admissible.

When reviewing this issue, we first note that during the hearing on the matter, counsel for Defendant conceded that the only part of Rule 412 that applied was (c)(1), the admissibility of the evidence is "[r]equired by the Tennessee or United States Constitution." In fact, the trial court stated that the "only way [the evidence] can come in under 412 *other than the [C]onstitution* is if it's to rebut or explain scientific or medical evidence. You don't have that. It's not to explain the source of semen, injury, disease, or knowledge of sexual matters. And it's not to prove consent. So the only way it could come in is your argument that it's otherwise unconstitutional. Is that a correct statement?" (Emphasis added) Defense counsel replied, "Yes."

Despite this perceived waiver, we will review the trial court's exclusion of the extrinsic evidence under the entirety of Rule 412. The issues in this case revolved around whether Defendant raped and sexually abused the victim during their Big Brothers Big Sisters mentor relationship on off-site visits which started in 2009 and ended in August of

-14-

2010. The victim testified to repeated instances of abuse during this time period. The defense's theory was that the abuse never occurred and that the victim had a relationship with W.C.L. during the period of the alleged abuse. Defendant wanted to introduce evidence of the victim's relationship with W.C.L. in order to show that the victim had a motive to lie about the actions of Defendant, not to show proof of sexual knowledge, that the acts were consensual, or to explain scientific evidence as outlined in Tennessee Rule of Evidence 412(c)(4)(i), (ii), and (iii).

The proof at the hearing indicated that any relationship with W.C.L. most likely occurred after the alleged abuse by Defendant. The victim admitted that he had a relationship with W.C.L., which he testified began after the abuse by Defendant stopped. The victim and his mother testified that he did not meet W.C.L. until after the victim's mother started dating Demareo Lee and did not start spending time with W.C.L. in Franklin until late 2010, around December. The victim had already reported the abuse by Defendant at that time. The victim reported the sexual relationship with W.C.L. to his mother after the family trip to Beech Bend in late spring of 2011. Additionally, W.C.L., who first reported to Franklin Police that the sexual contact occurred in late 2010, testified at the hearing that he could not recall exactly when the relationship occurred.

The evidence does not preponderate against the trial court's assessment that the evidence was not admissible pursuant to Rule 412(c)(4). The specific instances of sexual activity between the victim and W.C.L. are not relevant on the issue of consent; to rebut or explain scientific or medical evidence; to prove or explain the source of semen, injury, disease, or knowledge of sexual matters; or "to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented." Tenn. R. Evid. 412(c)(4). In particular, the issue of knowledge of sexual matters is inapt because of the timing of the report of the offenses vis a vis the relationship with W.C.L.

As recognized by 412(c)(1), however, there are instances where otherwise inadmissible evidence must be admitted in order to protect the constitutional rights of Defendant. Looking at the factors set forth in *Brown*, (i.e. whether the excluded evidence is critical to the defense; whether the evidence bears sufficient indicia of reliability; whether the interest supporting exclusion of the evidence is substantially important) we determine that the introduction of specific instances of "sexual knowledge" gained through a sexual relationship or experimentation with W.C.L. that, according to the testimony at the 412 hearing, most likely started in late 2010 after the abuse by Defendant was reported, are not critical to the issue of whether Defendant raped the victim. *See Brown*, 29 S.W.3d at 433-34

-15-

(citing *Chambers*, 410 U.S. at 298-301). While the evidence bears a sufficient indicia of reliability, in our assessment, "the interest supporting exclusion of the evidence is substantially important." *Id.* The introduction of all of the details of the victim's relationship with W.C.L. would have done little more than to result in a "trial of the rape victim based on [his] past sexual conduct," the exact opposite result to the purpose of the rape shield law. *Sheline*, 955 S.W.2d at 44.

The trial court herein struck a balance, allowing Defendant to cross-examine the victim about the consensual sexual relationship he had with W.C.L. without unnecessarily subjecting the victim to an invasion of his sexual privacy. The trial court properly balanced the evidence's probative value against the harm the disclosure would cause to the victim. We determine that the trial court did not abuse its discretion in excluding the specific evidence Defendant sought to introduce about the sexual relationship under Tennessee Rule of Evidence 412. Further, the trial court properly determined that while due process necessitated introduction of evidence about the relationship, that evidence was limited to testimony on cross-examination by Tennessee Rule of Evidence 608.

*Motion for Judgment of Acquittal/Sufficiency of the Evidence*

Defendant argues that the trial court erred in denying the motion for judgment of acquittal because the evidence was not legally sufficient to support the convictions for aggravated sexual battery and rape of a child. In the alternative, he argues that the trial court should have granted the motion for new trial because "the verdicts were against the weight of the evidence." Defendant specifically complains that the allegations against him were not "trustworthy," especially in light of the proof from the defense at trial that the allegations were not true. The State, on the other hand, argues that the jury assessed the credibility of the witnesses and determined that the evidence was sufficient to support the convictions.

A motion for judgment of acquittal requires that the trial court determine the sufficiency of the evidence. Tenn. R. Crim. P. 29(a). The standard of review for a motion for judgment of acquittal is the same as that utilized when analyzing the sufficiency of the convicting evidence. *State v. Blanton*, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). Thus, we treat Defendant's issue purely as a challenge to the sufficiency of the evidence.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is

whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of one count of aggravated sexual battery and three counts of rape of a child. Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "Sexual contact" has been defined to include "the intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's [or] the defendant's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). "Intimate parts" can include "the primary genital area, groin, inner thigh, buttock or breast." T.C.A. § 39-13-501(2). Rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). Tennessee Code Annotated section 39-13-501(7) defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body."

The State cited the following facts to support each count:

Count 2 Aggravated Sexual Battery - alleges an act of sexual contact and refers to the proof that the defendant and [the victim] masturbated one another's "private parts" on the "small couch" by the wall at the defendant's home until [the victim] ejaculated.

-17-

. . . .

Count 4 Rape of a Child - alleges an act of sexual penetration and refers to the proof that the defendant required [the victim] to perform fellatio on him on the couch at the defendant's home. The defendant first rubbed the back of [the victim's] head and pushed his head down to the defendant's lap. [The victim] started to "choke and gag."

Count 5 Rape of a Child - alleges an act of sexual penetration and refers to the proof that the defendant anally penetrated [the victim]. The defendant turned [the victim] around, rubbed his finger in [the victim's] "crack," put his finger "in and out," then "put his private part in." [The victim] cried. This incident ended when [the victim] felt "wet sticky stuff" on his back.

Count 6 Rape of a Child - alleges an act of sexual penetration and refers to the proof that the defendant anally penetrated [the victim]. [The victim] was sitting on the floor at the defendant's home and the defendant told him to get up; the defendant "put his finger in first, then his private part." [The victim] started to cry because he "didn't know why [he] was letting him do it." This incident ended when they "heard footsteps upstairs."

Viewing the evidence in a light most favorable to the State, the proof showed the victim was born on April 10, 1998. The victim testified in detail about incidents that occurred between January of 2009, when the mentor relationship moved to a community match, and November of 2010, when the victim reported the abuse to his mother. According to the victim, on at least one occasion, Defendant masturbated the victim to the point of ejaculation. The victim also described an incident in the room off the garage at Defendant's home, during which Defendant "touched" the victim's penis "with his mouth" and the victim was guided by Defendant to put the Defendant's penis in his mouth. The victim described that he "choke[d] and gag[ged]" and was instructed to go to the bathroom and "fix" himself after the fellatio concluded. On two other occasions, the victim described being in the room off the garage at Defendant's home when Defendant pushed down the victim's pants and rubbed the victim's behind before "put[ting] his finger in the hole." On both occasions, Defendant also inserted his penis into the victim's anus. On at least one of these occasions, the victim reported that Defendant ejaculated. Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions for rape of a child and aggravated sexual battery. The jury was presented with all of the facts leading up to the victim's report of the abuse to his mother, the positive reviews of Defendant given by the victim's family to Big Brothers Big Sisters, the report from the medical examination of the victim showing no physical signs of sexual abuse, and

the testimony of Defendant in which he denied all of the victim's allegations. Although Defendant asserts that the testimony at trial was not credible and that there was a lack of physical evidence, the jury obviously accredited the testimony of the victim and his mother. The credibility of witnesses and the weight afforded to their testimony are for the jury to determine and should not to be re-evaluated on appeal. *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Gentry*, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
TIMOTHY L. EASTER, JUDGE